Steve and Melissa MUNSEN, individually and as parents of Maxwell Munsen, a minor child, Plaintiffs,

v.

WELLMARK, INC., d/b/a Wellmark Blue Cross Blue Shield of Iowa, Defendant.

No. C 02–4115–MWB.

United States District Court,
N.D. Iowa,
Western Division.

May 27, 2003.

AMENDED AND SUBSTITUTED MEMORANDUM OPINION AND ORDER ON TRIAL ON THE MERITS

BENNETT, Chief Judge.

TABLE OF CONTENTS

I. INTRODUCTION ....................................................1175
 A. Procedural Background .......................................1175
 B. Initial Findings Of Fact ...................................1176
 1. Maxwell's condition ....................................1176
 2. Maxwell's daily caregivers .............................1178
 3. Policy provisions for private duty nursing .............1179
 4. Wellmark's termination of private duty nursing ........1180
 a. Case manager's doubts .............................1180

 b. *The phasing out of private duty nursing* ........................1182
 c. *The Munsens' first administrative appeal* ......................1182
 d. *The Munsens' second administrative appeal* ...................1183
 e. *Post-denial private duty nursing* ..............................1185

II. *LEGAL ANALYSIS AND FURTHER FINDINGS OF FACT* ...................1185
 A. *Review Of Wellmark's Denial Of Benefits For Private Duty Nursing* ....1185
 1. *Standard of review* ...........................................1185
 a. *"Deferential" review of factual determinations* ..................1186
 b. *"Less deferential" review of factual determinations* ..............1187
 c. *Review of interpretations of plan terms* .......................1187
 2. *Wellmark's interpretation of pertinent plan terms* ....................1188
 a. *"Homebound"* ...............................................1188
 b. *"Custodial care"* ...........................................1192
 c. *"Medical necessity"* .........................................1194
 d. *"Medical stability" and "medical fragility"* .....................1194
 3. *Substantial evidence* .........................................1195
 a. *The "not homebound" determination* ..........................1195
 i. *Arguments of the parties* ................................1195
 ii. *Analysis* .............................................1196
 b. *The "custodial care"/"medical necessity" determination* .........1199
 i. *Arguments of the parties* ................................1199
 ii. *Analysis* .............................................1200
 B. *Relief* ........................................................1202
 1. *Recovery of lost benefits* .......................................1202
 2. *Future relief* .................................................1203

III. *CONCLUSION* ...............................................1203

## I. INTRODUCTION

### A. *Procedural Background*

On December 19, 2002, plaintiffs Steve and Melissa Munsen, individually and as parents of their minor son, Maxwell Munsen, filed this lawsuit pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*, against defendant Wellmark, Inc., doing business as Wellmark Blue Cross Blue Shield of Iowa (Wellmark). In the single count of the Complaint, the Munsens allege that Wellmark's denial of coverage for private duty nursing for their son is a breach of their Wellmark health benefits policy, which is governed by ERISA. The Munsens, therefore, seek to recover the benefits that Wellmark has denied and to enjoin Wellmark to pay such benefits for the remainder of the policy term pursuant to section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

Along with their Complaint the Munsens also filed a motion for preliminary injunction to enjoin Wellmark to pay for private duty nursing services during the pendency of this action. Although the court set the motion for preliminary injunction for hearing on January 2, 2003, then reset the hearing for January 17, 2003, the parties were able to negotiate a partial settlement agreement under which Wellmark agreed to pay for private duty nursing services through April 13, 2003, in return for the Munsens' withdrawal of their motion for preliminary injunction and an agreement to an expedited trial on the merits. Consequently, the Munsens withdrew their motion for preliminary injunction on January 15, 2003. The court then cancelled the preliminary injunction hearing and set this matter for a bench trial at the earliest available date. Wellmark answered the Munsens' Complaint on March 6, 2003, and this matter proceeded to trial without other incident requiring mention here.

On April 3 and 4, 2003, the undersigned presided over a bench trial in this action, which was exceptionally well-presented on behalf of both the plaintiffs and the defendant. At the trial, the Munsens were represented by John C. Gray and Joel D. Vos of Heidman, Redmond, Fredregill, Patterson, Plaza & Dykstra, L.L.P., in Sioux City, Iowa. Wellmark was represented by L.W. Rosebrook of Nyemaster, Goode, Voigts, West, Hansell & O'Brien, P.C., in Des Moines, Iowa. This matter is now fully submitted for disposition by the court.

### B. Initial Findings Of Fact

The court will present here its findings of undisputed facts and its resolution of some of the factual disputes between the parties, so that its legal analysis to follow will be put in the proper context. However, the court will reserve certain critical findings of fact for the pertinent place in its legal analysis, where their significance will be most apparent.

### 1. Maxwell's condition

Maxwell Joel Munsen, the son of plaintiffs Steve and Melissa Munsen, was born extremely prematurely on April 11, 1998, after only twenty-six weeks gestation. His twin sister survived only thirty-one days. Maxwell, who has just had his fifth birthday, is non-ambulatory and non-verbal. More specifically, he has been diagnosed with the following conditions: spastic quadriplegia cerebral palsy, seizure disorder, shunted hydrocephalus, feeding difficulties necessitating gastrostomy tube feedings, chronic lung disease and subglottic stenosis requiring a tracheostomy, and periodic saturated oxygen deficiencies requiring supplemental oxygen.[1] Nevertheless, Maxwell's cognition is good and his physical condition has generally "stabilized."

As an example of the "stabilization" of Maxwell's condition, his seizure disorder has been largely controlled with adjustments to his medication, so that he has not had a seizure requiring transportation to the emergency room since October 2001. However, his most recent electroencephalogram (EEG) in February 2002 shows continuing seizure activity, and he apparently still experiences "minor" seizures, manifested, for example, by "blank stares"

---

1. The court has no significant medical training and will not pretend to be as familiar with the terms describing Maxwell's conditions as the parties are, or have become, by training or necessity. Therefore, the court has referred to a standard medical dictionary for the following definitions: "spastic" means "[r]elating to spasm or spasticity," a definition that begs for the definition of "spasticity," which in turn means "[o]ne type of increase in muscle tone at rest; characterized by increased resistance to passive stretch, velocity dependent and asymmetric about joints (i.e., greater in the flexor muscles at the elbow and the extensor muscles at the knee)"; "quadriplegia" means "[p]aralysis of all four limbs"; "cerebral palsy" is "a generic term for various types of nonprogressive motor dysfunction present at birth or beginning in early childhood"; a "seizure" is "[a]n attack; the sudden onset of a disease or of certain symptoms" or a "convulsion"; "hydrocephalus" is "[a] condition marked by an excessive accumulation of cerebrospinal fluid resulting in dilation of the cerebral ventricles and raised intracranial pressure [which] may also result in enlargement of the cranium and atrophy of the brain"; a "shunt" (as in "shunted hydrocephalus") is "[a] bypass or diversion of fluid to another fluid-containing system by ... a prosthetic device"; a "gastrostomy" is the "[e]stablishment of a new opening into the stomach"; "stenosis" means "[a] stricture of any canal or orifice"; "subglottic" (as in "a subglottic stenosis") means "infraglottic," and so means "[i]nferior to the glottis," where "glottis" in turn means "[t]he vocal apparatus of the larynx"; and, finally, "tracheostomy" means "[a]n operation to make an opening into the trachea," where the "trachea" is "[t]he air tube extending from the larynx into the thorax ... where it bifurcates into the right and left main bronchi [of the lungs]." STEDMAN'S MEDICAL DICTIONARY (27th ed.2000).

or "arm twitches," lasting from seconds up to about two minutes, with some frequency. During some of his serious seizures, that is, those prior to November 2001, Maxwell required "bagging" to get enough oxygen, care to prevent vomit from clogging his tracheostomy tube, and careful adherence to a neurologist's protocols for administration of medications and/or transportation to an emergency room for emergency treatment. The Munsens still have these protocols for responding to a serious seizure posted on the wall in Maxwell's bedroom.

Probably the most immediately life-threatening condition from which Maxwell still suffers is the subglottic stenosis, which requires a tracheostomy to allow him to breathe. If the "trach tube" in his tracheostomy, through which Maxwell now breathes, should become clogged, it must be cleared immediately. Therefore, because of Maxwell's lung condition and the presence of the trach tube, part of Maxwell's daily care is frequent suctioning of his trach tube. Also, if the trach tube should become dislodged for any reason, the record shows that it must be replaced within approximately one minute, or the constriction of Maxwell's airway may prevent insertion of a new tube, and Maxwell could suffocate and die. The Munsens always have at least two spare trach tubes available, one of Maxwell's current size, and one a size smaller, in case Maxwell's airway becomes too constricted after his trach tube gets dislodged to allow his caregivers to replace the tube with one of the same size. Although the Munsens are trained to replace a trach tube, and both Steve and Melissa have changed tubes on occasion, there appears to be no dispute— and the court therefore finds—that replacement of a trach tube is ordinarily a procedure requiring at least trained nursing skills. Furthermore, because of Maxwell's lung condition and the presence of the trach tube, vomiting as the result of ill

health, feeding problems, or a seizure presents a serious threat of plugging the trach tube, lungs, or airways. It is partly for this reason that Maxwell's gastrostomy tube feedings and the oral feedings he is now attempting must be properly performed or carefully monitored to be sure that no vomiting or reflux obstructs his breathing. In short, the court finds that Maxwell's condition could still change from "stable" to a life-threatening emergency in a matter of seconds, with little or no warning.

Maxwell is essentially bed- or wheelchair-bound, because he is non-ambulatory. However, he spends at least one, and usually two, periods of approximately forty-five minutes a day in a "stander," which braces him in a standing position, to help him develop muscle tone and otherwise to acclimate his body systems to being upright. He has an electric wheelchair, which he is learning to "drive," so that he will have some limited mobility under his own control. However, Maxwell plainly cannot ever leave the home under his own power; he can only do so with the assistance of both a substantial amount of equipment, including redundant equipment for safety, and other people.

The Munsens testified without contradiction that it requires at least two people to take Maxwell out of the house for any reason: one person to drive the car, and the other, trained in Maxwell's care, to monitor his condition and respond to any problems he may have. They testified further, again without contradiction, that *if all of the necessary equipment and supplies are already prepared*, it takes approximately fifteen minutes to load Maxwell and the necessary items into a vehicle to take Maxwell on any kind of "outing." However, preparation of the necessary equipment and supplies for any outing, even as thoroughly practiced as the Mun-

sens have become, requires considerable additional time, as it involves making sure that all equipment and back-up equipment is clean, working, and ready to load, and that all necessary supplies and medications, for routine care or emergencies, is also packed and ready. After any outing away from home, all of the equipment and supplies must be unloaded, cleaned, put away, or replenished, as necessary. Plaintiffs' Exhibit 20 is a typewritten list, running over a page, of items that the Munsens must have for an overnight excursion, although most of the listed items would also be necessary for a shorter excursion. Melissa Munsen testified, again without contradiction, that the process of preparing for an outing is sufficiently onerous that, whenever possible, the Munsens attempt to combine activities into a single outing, preferably at one location, so that no additional loading and unloading of Maxwell from their vehicle is required between activities. For example, if they are going to the mall to give Maxwell an opportunity to practice "driving" his wheelchair, they also have a list of items they need to buy, and they may plan to treat themselves to "eating out" at the mall. Melissa Munsen testified that, on average, they had probably taken Maxwell on outings, other than for school or medical appointments, only about three times a month during the past twelve months.

### 2. Maxwell's daily caregivers

Notwithstanding the extent and gravity of Maxwell's conditions, he has lived at home with his parents from the time that he was released from the hospital after birth until the present, with the exception of temporary hospital stays for emergency or other treatment. Before the Munsens were allowed to take Maxwell home, however, they were required to demonstrate their ability to provide all of his necessary care during a "test" at the hospital over an extended period of 48 to 72 hours. Although both Steve and Melissa Munsen have been trained in necessary procedures to deal with Maxwell's conditions on a "routine" and "emergency" basis, Steve concedes that Melissa is the more thoroughly skilled caregiver of the two and actually provides substantially more of Maxwell's care. Steve works full-time as a technician for South Dakota Public Television in Vermillion, South Dakota, which, in addition to work time, involves a daily commute to and from the Munsens' residence in South Sioux City, Nebraska, so that he is away from home from about 7:30 a.m. until about 5:00 p.m. on workdays. Although Melissa Munsen also worked part-time outside of the home for approximately 20 hours per week just before Wellmark phased out benefits for private duty nursing, she has since quit her job to stay at home with Maxwell. The Munsens also recently celebrated the arrival of Maxwell's baby sister, Madelynn, so that the Munsens currently care for a newborn as well as Maxwell.

Other family members provide some of Maxwell's care. Steve's fourteen-year-old son by a previous marriage, Christopher, provides some simple care and plays with Maxwell when he visits every other weekend. Melissa's father has also received some training in the "skilled" and "emergency" aspects of Maxwell's care. However, he prefers not to be left alone with Maxwell, so that he generally will only watch Maxwell if Melissa's mother accompanies him to do what the Munsens describe as the "grandma things."

One of the key issues in this case is whether private duty nursing for Maxwell is required under the terms of the health policy. Without getting embroiled in that question until it comes up in the court's legal analysis, suffice it to say that, prior to August 2002, Wellmark provided private duty nursing, at the registered nurse

(R.N.) or licensed practical nurse (L.P.N.) level, for 49 hours per week. The Munsens' school district also provided a private duty nurse three mornings a week for the periods during which Maxwell attended preschool, including his transportation to and from school on a school bus. As Wellmark phased out benefits for private duty nursing, a Wellmark representative assisted the Munsens with an application for Nebraska Medicaid funding for private duty nursing services. Nebraska Medicaid now pays up to $3,600 per month for such services, which currently makes available approximately 100 hours of private duty nursing services per month. There is no indication that if Wellmark's benefits for private duty nursing are reinstated, Nebraska Medicaid will terminate, phase out, or limit its payments for private duty nursing services. Indeed, the evidence is that Medicaid-funded private duty nursing is available for "respite" care, while private duty nursing benefits under the Wellmark policy are only available on a more restricted basis.

The nurses who have actually provided private duty nursing services for Maxwell have almost all been R.N.s. Indeed, it appears that all have been R.N.s since an L.P.N. inadvertently administered an incorrect dosage of a medication, Baclofen, to Maxwell, which caused Maxwell to have a serious seizure. In addition to licensing requirements, the R.N.s and L.P.N.s who have provided Maxwell with private duty nursing have needed extensive additional training, usually provided by Melissa, in the specific procedures required for Maxwell's care. Some of the nurses who have arrived to provide Maxwell with private duty nursing have declined to stay or have declined to return after discovering the extent and nature of the care that Maxwell requires and the training necessary to provide such care.

The Munsens have used private duty nurses primarily during the daytime hours while Steve is at work. At night, Steve and Melissa Munsen have provided nearly all of Maxwell's care. The family has a camera monitoring system, as well as other monitors and alarms, such as a pulse oximeter with an alarm, to monitor Maxwell's condition while he sleeps. The court finds from their testimony that the Munsens are "up" with Maxwell nightly, usually more than once a night, to assist him with matters typical of young children or matters unique to his medical conditions.

### 3. Policy provisions for private duty nursing

Until August 2002, Wellmark provided private duty nursing for Maxwell under the terms of a health benefits policy, or "Benefits Certificate," that the Munsens had obtained through one of Steve Munsen's prior employers. Benefits under that policy are to continue, under a "COBRA" extension, until December 31, 2003. The premium for the COBRA extension is paid by the State of Nebraska.

Although it is by no means the only provision of the Benefits Certificate that the court will have to explore in this decision, for now it suffices to say that the provision of the Benefits Certificate providing benefits for private duty nursing is the following:

**Private Duty Nursing** services are covered when:
- Services are provided in your home by a registered nurse (R.N.) or a licensed practical nurse (L.P.N.);
- Services are prescribed by a practitioner for the treatment of illness or injury when you are homebound; and
- Services are contracted by the Joint Commission for the Accreditation of Health Care Organizations (JCAHO) and/or a Medicare-certified agency.

For covered private duty nursing services, reimbursement will not exceed the amount Wellmark would provide for a comparable level of care in a facility setting. Before you receive private duty nursing services, you must request pre-certification approval. . . .

Plaintiffs' Exhibit 1, Benefits Certificate, 14. The critical question in this case is whether Maxwell is entitled to private duty nursing under these policy terms. However, resolution of that question involves an extensive discussion to follow in the court's legal analysis.

### 4. Wellmark's termination of private duty nursing

### a. Case manager's doubts

As mentioned above, until August 2002, Wellmark paid for 49 hours per week of private duty nursing for Maxwell. This level of private duty nursing continued even after Maxwell began attending preschool three mornings a week accompanied by a private duty nurse paid for by the local school district. Indeed, on April 9, 2002, a representative of the home health care agency that provided Maxwell's private duty nurses made a Coordination of Services record of a telephone conversation with the Individual Case Manager assigned to Maxwell's case,[2] confirming that Maxwell was considered "homebound," and therefore, entitled to private duty nursing services, even though he was attending school three mornings a week. *See* Plaintiffs' Exhibit 13.

More specifically, the Coordination of Services record was prepared by "M. Pick, RN," regarding a telephone conference with Barb Heikes, R.N., the "Case Manager" for Maxwell Munsen. The court's reading of the document, based in part on the testimony concerning the document presented at trial, is as follows:

4/9/02 1030 [10:30 a.m.] PC [*i.e.*, phone call] to CM [*i.e.*, case manager]. Pt [*i.e.*, patient] current services et [and?] condition reviewed. CM states pt considered homebound even though pt going to school. Approval to cont[inue] current services. This RN [*i.e.*, registered nurse] to fax CM notes et [and?] case plan.

Plaintiffs' Exhibit 13. Although Wellmark originally disputed the contention that the document was any kind of "admission" that Wellmark still considered Maxwell "homebound" after he started going to school regularly, counsel for Wellmark later conceded that the document was a record of a

---

2. The Benefits Certificate explains "Individual Case Management (ICM)" as follows:

Certain medical conditions may require costly, long-term care. A hospital may not be the most appropriate setting for your treatment. That's why [Wellmark] provides you with the opportunity to receive alternative benefits to help meet health care needs resulting from extreme illness or injury (providing that costs do not exceed inpatient facility costs). You, your physician, and the hospital can work with our case managers to identify and arrange alternative treatment plans to meet your special needs and to assist in preserving your health care benefits. We call this benefit *individual case management* (ICM). Conditions and treatment planing where ICM might be appropriate are:

Coma.
HIV/AIDS.
Long–Term Intravenous Therapy.
Respiratory Dependency.
Spinal Cord Injury.
Traumatic Brain Injury.
Some services are excluded or listed as standard certificate limitations. However, we may waive certain exclusions or limitations for individual case management with the agreement of our medical director. Each individual case management case is handled on an individual basis and the benefit program is tailored to address the circumstances of each case.
Plaintiffs' Exhibit 1, Benefits Certificate, at 15.

conversation between Ms. Pick and Barb Heikes, and that it reflected Barb Heikes's agreement that Maxwell was still "homebound," even though he was attending school, and, therefore, still entitled to private duty nursing services in April of 2002. Moreover, while Barb Heikes testified that she had no recollection of the telephone call identified in this document, she testified that she believed that Maxwell was still "homebound" and still entitled to private duty nursing benefits even after he started school, apparently because he was still suffering from respiratory problems.

However, Wellmark subsequently reevaluated Maxwell's entitlement to benefits for private duty nursing. By letter dated August 2, 2002, Barb Heikes notified the Munsens that Wellmark had reviewed Maxwell's case and had approved private duty nursing for 42 hours per week for two weeks effective August 5, 2002. *See* Defendant's Exhibit L. No reason for the reduction in hours, apart from a suggestion that it was based on a review of the case on an individual basis, appears in the August 2, 2002, letter. The court finds that Wellmark's review of Maxwell's entitlement to private duty nursing began well before Ms. Heikes sent the August 2, 2002, letter, but that the Munsens were unaware of any such review or questions on Wellmark's part about whether or not Maxwell was still "homebound" until they received a telephone call from Barb Heikes just before they received the August 2, 2002, letter.

Specifically, Ms. Heikes testified, and the court finds, that Wellmark's review of Maxwell's entitlement to private duty nursing began in June 2002, and that it was prompted by Ms. Heikes's investigation of other matters *raised by Melissa Munsen* that were only tangentially related to Maxwell's *entitlement* to private duty nursing services. Specifically, Barb Heikes testified that Melissa Munsen was "particular" about the nurses who provided private duty nursing services and that Melissa had complained to Ms. Heikes about "issues" or "concerns" with providers of both private duty nursing services and durable equipment. It was in the course of investigating and "mediating" these issues that, according to her testimony, Ms. Heikes "began to question" whether Maxwell was "homebound" as required to receive payment for private duty nursing services under the Wellmark Benefits Certificate. Whatever prompted her concerns about whether or not Maxwell was "homebound," the court finds that Ms. Heikes never communicated her doubts to the Munsens until just prior to sending them the August 2, 2002, notice that the hours of private duty nursing were being reduced.

Ms. Heikes testified that, prior to sending the letter dated August 2, 2002, she reviewed the nursing records from the home health care provider. From those notes, Ms. Heikes concluded that Maxwell appeared to be "medically stable" and that the "cares" that the private duty nurses were providing had become "routine." Ms. Heikes also observed that there were several notes in the nursing records indicating "outings" that were not for medical treatment or school. A summary of such "outings" from March 2002 through July 2002 identified by Ms. Heikes was presented at trial, and includes some fourteen activities. Those activities ranged from "outings" as close to home as sitting on the front porch or playing with Steve Munsen on a swing and slide in the Munsens' yard, to activities further afield, including dining out, attending church, going to the mall, visiting a zoo, and, finally, taking a family trip to the Black Hills near Rapid City, South Dakota, in July 2002, which the Munsens undertook without a private duty nurse. The Munsens pointed out that it was possible for them to make the Black Hills trip without a private duty nurse,

because both skilled caregivers in the family were available 24 hours a day, as Steve was not working during the family's vacation.

Ms. Heikes testified that her "review" of the private duty nursing issue involved conferences with her "Team Leader," who was also a registered nurse, and the "Medical Director" assigned to the case, Dr. Davis, who was a physician, as well as one visit to the Munsens' home, during which Ms. Heikes observed the care Maxwell received for about one to one-and-a-half hours. However, the court finds that, even if Ms. Heikes considered the home visit part of her "review" of the need for private duty nursing services, that was not the reason given to the Munsens for the visit, which instead was that the visit was part of the investigation of Melissa's concerns about durable equipment and the quality of private duty nursing services that she was receiving from various providers. Ms. Heikes testified that, during the visit, Melissa pointed out the "go bags" that the Munsens kept prepared to take Maxwell out of the home for school, medical appointments, emergencies, or for other reasons. However, there is no indication in the record that Ms. Heikes engaged in any conversation with the Munsens or any of the private duty nurses, then or ever, about the amount of effort or preparation involved in taking Maxwell out of the home for any "outings," and the court, therefore, finds that she did not do so.

### b. The phasing out of private duty nursing

On August 16, 2002, Wellmark, again in the person of Ms. Heikes, sent the Munsens notice of a further reduction—indeed, a gradual phasing out—of private duty nursing hours. *See* Plaintiffs' Exhibit 2. Again, this letter indicated no reason for the change, apart from a suggestion that it was the result of a review of the case on an individual basis. *Id.* This time, the change

involved a reduction of private duty nursing services to 35 hours per week for two weeks beginning August 19, 2002; a further reduction to 28 hours per week for two weeks effective September 2, 2002; a reduction to 21 hours per week for two weeks effective September 16, 2002; a reduction to 14 hours per week for two weeks effective September 30, 2002; a reduction to 7 hours per week for two weeks effective October 14, 2002; and complete termination of private duty nursing services effective October 28, 2002.

### c. The Munsens' first administrative appeal

The Munsens appealed the termination of benefits for private duty nursing services by Wellmark by letter dated August 22, 2002. Their appeal was accompanied by three letters from Maxwell's health care providers. Their appeal prompted a further administrative review by Wellmark, this time by Dr. Dale Andringa, Wellmark's Chief Medical Officer. Dr. Andringa testified that he "talked" to Barb Heikes, reviewed a summary of the nursing record prepared by Barb Heikes, but not the full four hundred some pages of nursing records now in the record in this case, the Munsens' appeal letter, and the three letters from providers attached to the Munsens' appeal. However, following this review, he testified that he affirmed the denial of further payment for private duty nursing services. He acknowledged that the only reason given for affirming the denial of benefits in the letter conveying his decision to the Munsens—dated September 11, 2002, and again over the signature of Barb Heikes—was that "Maxwell is no longer homebound." *See* Plaintiffs' Exhibit 4 & Defendant's Exhibit B (third unnumbered paragraph).

The letter conveying Dr. Andringa's determination on appeal included the follow-

ing language concerning a claimant's right to obtain certain information:

> The name and credentials of the medical expert consulted with this adverse benefit determination is available upon written request. Copies of the medical necessity criteria and medical and departmental policies that were consulted in this case are available upon written request. You may also have access to or copies of all relevant documents relied upon in making this final decision upon written request.

*Id.* (fourth unnumbered paragraph). On September 17, 2002, the Munsens wrote to Barb Heikes requesting such information, identified in identical terms. *See* Defendant's Exhibit C. In response, Barb Heikes provided only the name of Dr. Andringa. *See* Defendant's Exhibit D. At some point, the Munsens also asked Barb Heikes for a new copy of their Benefits Certificate and a copy of the definition of "homebound" upon which she was relying. Barb Heikes sent the Munsens a copy of the definition of "homebound" from the glossary on the Wellmark website. As shall be discussed in greater detail below, in the court's legal analysis, the definitions of "homebound" in the Benefits Certificate and in the on-line glossary are different, but Wellmark concedes that the definition in force at the time was the on-line definition, which had superseded the prior definition in the Benefits Certificate.

### d. The Munsens' second administrative appeal

Following denial of their first administrative appeal, the Munsens retained counsel to correspond further with Wellmark concerning the denial of coverage for private duty nursing. On November 6, 2002, following conversations between the Munsens' attorney and counsel for Wellmark, Kevin D. Van Dyke, Assistant General Counsel for Wellmark, sent the Munsens' counsel a letter notifying the Munsens that

"Wellmark will conduct an additional appeal related to the discontinuation of benefits for the Munsens' son, Maxwell" and that "[t]he appeal will be conducted by a physician not previously involved in the case." Defendant's Exhibit F.

The second appeal was considered by Dr. Stephen C. Spurgeon, who is also a Medical Director for Wellmark. On November 7, 2002, before Dr. Spurgeon conducted his review, Mr. Van Dyke sent him the following e-mail:

> Dr. Spurgeon, I believe you have or soon will be receiving a file from Barb Heikes regarding a minor child, Maxwell Munson [sic]. An additional appeal of this file is being conducted at my request. It is my understanding private duty nursing benefits were withdrawn as of November 4. In your review, please review the file from two contractual standpoints. First, whether Maxwell qualifies for private duty nursing under the applicable benefit certificate, i.e., is Maxwell homebound? Second, is Maxwell receiving skilled care or custodial care (this becomes a medical necessity determination under the applicable medical necessity provision of Maxwell's benefit certificate). The prior appeals in this file focused on the private duty nursing aspect. I want to be sure your review is expanded to include consideration of whether Maxwell is receiving skilled care in light of issues raised by Maxwell's legal counsel. Thank you for your assistance. Please call me if you have any questions as you review this file. Also, could you let me know your time frame for completing the review.

Defendant's Exhibit G–2. The court finds that this e-mail is the first explicit reference to "medical necessity" or "custodial care" as issues in the determination of whether private duty nursing services for Maxwell should continue under the Bene-

fits Certificate. Prior to this e-mail, as demonstrated by the letters conveying Wellmark's determination not to continue paying for such services, and as indicated in the trial testimony of Dr. Andringa, who performed the first appeal review, and Ms. Heikes, who first concluded that private duty nursing benefits should be terminated, the only express basis for the denial of coverage for private duty nursing services—when any reason was given—was that Maxwell was no longer "homebound."

Dr. Spurgeon did not testify at the trial on the merits in this case. Instead, Dr. Andringa testified that he "suspected" that Dr. Spurgeon would have reviewed the same things that Dr. Andringa and Dr. Davis had previously reviewed. Whatever he may or may not have reviewed, Dr. Spurgeon affirmed Wellmark's termination of private duty nursing benefits. He apparently conveyed his conclusion to Mr. Van Dyke in a voice mail message, and Mr. Van Dyke requested a written summary of his review. *See* Defendant's Exhibit G–1 (e-mail of November 19, 2002, from Van Dyke to Spurgeon). Dr. Spurgeon responded to the request for a written summary by e-mail as follows:

I reviewed the file and agree that the care at [the] present time is custodial. My concern is that from time to time (freq.Uncertain) the level of care will change to more acute. I recommend that we remain proactive by continuing to moniter [sic] the case thru [sic] case management on a biweekly basis for three months then re-eval[uate].

*Id.* (e-mail of November 20, 2002, 4:00 p.m., from Spurgeon to Van Dyke). This summary of Dr. Spurgeon's conclusions prompted a further query from Mr. Van Dyke, as follows:

Are you saying we should continue with some level of private duty nursing or skilled care at this point? My understanding is that we ended PDN [*i.e.,*

private duty nursing] benefits as of November 4. Thank you for your assistance.

*Id.* (e-mail of November 20, 2002, 4:09 p.m., from Van Dyke to Spurgeon). Dr. Spurgeon responded as follows:

No level of nursing care, but occasional telephonic check-ins to make sure things are running smoothly.

*Id.* (e-mail of November 20, 2002, 4:13 p.m., from Spurgeon to Van Dyke). Thus, as characterized by Dr. Spurgeon himself, the only basis for his determination that Maxwell did not qualify for private duty nursing benefits was that he was receiving only "custodial" care. Dr. Spurgeon made no mention of a determination that Maxwell was "no longer homebound."

Dr. Spurgeon's decision on the second appeal was conveyed to the Munsens' attorney by letter dated November 22, 2002, over the signature of Mr. Van Dyke. *See* Defendant's Exhibit H. The pertinent portion of the letter, the first paragraph, states the following:

We have received the results of the additional appeal related to the discontinuation of private duty nursing benefits for the Munsens' son, Maxwell. The appeal was conducted by a Medical Director not previously involved in the review of this case. The appeal affirmed the prior determination that the private duty nursing services at issue were not covered by the language and terms of the Munsens' Benefits Certificate because of its limitation with regard to the patient being "homebound" and because of its non-coverage for "custodial care". This is different coverage than is provided for by Medicaid, which does provide for some level of respite care. On the other hand, the Benefit[s] Certificate still does cover physician visits and other medically necessary skilled care needs, and the Medical Director has suggested that we

continue to monitor Maxwell's situation periodically in case his medical condition should worsen in some fashion that would create coverage under Wellmark's private duty nursing benefit. Defendant's Exhibit H–1 (first unnumbered paragraph). The court finds that this letter conveying the determination on the Munsens' second appeal is the first express statement *to the Munsens* of Wellmark's reliance on a limitation on "custodial care" in addition or in the alternative to Wellmark's previous reliance on a determination that Maxwell was "no longer homebound." Subsequent paragraphs of the letter notified the Munsens that their administrative review had been exhausted and that they, therefore, had the right to file an action under ERISA or to seek external review through the Iowa Commissioner of Insurance. *Id.* (second and third unnumbered paragraphs). The Munsens chose the former course, and filed the present action under ERISA.

### e. Post-denial private duty nursing

Although Wellmark concluded its administrative review of its determination that Maxwell was no longer entitled to private duty nursing in November 2002, Wellmark authorized private duty nursing services, at the Munsens' and their physician's request, while Maxwell suffered from a bronchial infection in December 2002 and January 2003. Specifically, on December 3, 2002, Wellmark authorized 16 hours of private duty nursing for the period December 3 through December 7; on December 6, 2002, Wellmark authorized 12 hours of private duty nursing for the period December 7 through December 9; on December 11, 2002, Wellmark authorized 68 hours of private duty nursing for the period December 11 through December 27; on December 16, Wellmark revised the prior authoriza-tion to authorize 72 hours of private duty nursing for the period December 16 through December 27; on December 27, 2002, Wellmark authorized 28 hours of private duty nursing for the period December 28, 2002, through January 3, 2003; and on January 3, 2003, Wellmark authorized 48 hours of private duty nursing for the period January 4, 2003, through January 15, 2003. Also, on January 14, 2003, the parties executed a Partial Settlement Agreement and Release pursuant to which Wellmark agreed to approve and pay for up to 56 hours of private duty nursing care every two weeks, at $39.00 per hour, beginning January 16, 2003, and ending April 13, 2003, and the Munsens agreed to withdraw their application for a preliminary injunction in this action. *See* Joint Exhibit A.[3]

With this factual background, the court turns to its legal analysis of the issues presented.

## II. LEGAL ANALYSIS AND FURTHER FINDINGS OF FACT

### A. Review Of Wellmark's Denial Of Benefits For Private Duty Nursing

#### 1. Standard of review

■ Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), provides that "a participant or beneficiary" may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Thus, " 'ERISA provides a plan beneficiary with the right to judicial review of a benefits determination.' "

---

3. The court will touch on further terms of the Partial Settlement Agreement below, in its legal analysis, but only to the extent that they impact any relief to which the court may find that the Munsens would otherwise be entitled.

*Norris v. Citibank, N.A., Disability Plan,* 308 F.3d 880, 883 (8th Cir.2002) (quoting *Woo v. Deluxe Corp.,* 144 F.3d 1157, 1160 (8th Cir.1998), and citing 29 U.S.C. § 1132(a)(1)(B)); *Jackson v. Metropolitan Life Ins. Co.,* 303 F.3d 884, 887 (8th Cir. 2002) (citing *Donaho v. FMC Corp.,* 74 F.3d 894, 898 (8th Cir.1996)); *Shelton v. ContiGroup Cos., Inc.,* 285 F.3d 640, 642 (8th Cir.2002) (also quoting *Woo* ); *Delta Family–Care Disability & Survivorship Plan v. Marshall,* 258 F.3d 834, 840 (8th Cir.2001), *cert. denied,* 534 U.S. 1162, 122 S.Ct. 1173, 152 L.Ed.2d 117 (2002).

### a. "Deferential" review of factual determinations

■ Although beneficiaries are entitled under ERISA to judicial review of an administrator's denial of benefits, where the plan gives the administrator discretionary authority to determine eligibility for benefits, courts ordinarily review the administrator's decision only for an "abuse of discretion." *See id.* (again citing *Woo* ); *Shelton,* 285 F.3d at 642 (also citing *Woo* ); *Clapp v. Citibank, N.A., Disability Plan (501),* 262 F.3d 820, 826 (8th Cir.2001); *Marshall,* 258 F.3d at 840.[4] " 'This deferential standard reflects [the courts'] general hesitancy to interfere with the administration of a benefits plan.' " *Id.* (quoting *Layes v. Mead Corp.,* 132 F.3d at 1246, 1250 (8th Cir.1998)). The parties here do not dispute that the Benefits Certificate gives Wellmark the discretion to interpret the plan language, so that this "deferential" standard of review appears to be applicable, at least until and unless the Munsens establish that Wellmark's decision is entitled to less deferential review.

■ As this court recently explained,

Under the deferential abuse-of-discretion standard applicable to judicial review of the eligibility determination at issue here, "a reviewing court should consider only the evidence before the plan administrator when the claim was denied." *Shelton,* [285] F.3d at [642]. The court must "look to see whether [the administrator's] decision was reasonable." *Clapp,* 262 F.3d at 828; *Marshall,* 258 F.3d at 841. As the Eighth Circuit Court of Appeals has explained,

In doing so, [the court] must determine whether the decision is supported by substantial evidence, "which is more than a scintilla, but less than a preponderance." *Sahulka v. Lucent Techs., Inc.,* 206 F.3d 763, 767–68 (8th Cir.2000) (internal quotes omitted). [The administrator's] decision "will be deemed reasonable if a reasonable person could have reached a similar decision, given the evidence before him, not that a reasonable person would have reached that decision." *Cash [v. Wal–Mart Group Health Plan],* 107 F.3d [637,] 641 [ (8th Cir. 1997) ] (internal quotes omitted). [The court] will not disturb a decision supported by a reasonable explanation "even though a different reasonable interpretation could have been made." *Id.* [The court must] consider "[b]oth the quantity and quality of the evidence." *Fletcher–Merrit v. NorAm Energy Corp.,* 250 F.3d 1174, 1179 (8th Cir.2001).

*Clapp,* 262 F.3d at 828; *accord Marshall,* 258 F.3d at 841. "Put another way, the [administrator's] decision need not be the only sensible interpretation, so long as its decision offer[s] a reasoned explanation, based on the evidence, for a

---

4. Although a district court ordinarily reviews an administrator's decision only for abuse of discretion, an appellate court "reviews a district court's application of the abuse of discretion standard *de novo.*" *Jackson,* 303 F.3d at 887; *Clapp,* 262 F.3d at 828; *Marshall,* 258 F.3d at 841.

particular outcome." *Marshall,* 258 F.3d at 841 (citing *Donaho v. FMC Corp.,* 74 F.3d 894, 899 (8th Cir.1996)). *Brant v. Principal Life & Disability Ins. Co.,* 195 F.Supp.2d 1100, 1108–09 (N.D.Iowa 2002), *aff'd,* 50 Fed. Appx. 330 (8th Cir. Nov.7, 2002) (unpublished op.); *West v. Aetna Life Ins. Co.,* 171 F.Supp.2d 856, 866–67 (N.D.Iowa 2001). In short, "[a] plan administrator's fact-based disability decision is reasonable if it is supported by 'substantial evidence.'" *Norris,* 308 F.3d at 883–84 (citing *Fletcher–Merrit v. NorAm Energy Corp.,* 250 F.3d 1174, 1179 (8th Cir.2001)); *Jackson,* 303 F.3d at 887. This standard applies, unless a less deferential standard is shown to be applicable, to Wellmark's *fact-based determinations* that Maxwell was not "homebound," or, in the alternative, was receiving only "custodial care," and therefore, was not entitled to private duty nursing services under the terms of the Benefits Certificate.

### b. *"Less deferential" review of factual determinations*

■ The Munsens argue that a less deferential standard of review is applicable here. As the Eighth Circuit Court of Appeals has explained,

We may apply a less deferential standard of review if the plaintiff presents "material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty" to the plaintiff. *Woo,* 144 F.3d at 1160. An alleged conflict or procedural irregularity must have some connection to the substantive decision reached. *Id.* at 1161. A claimant must offer evidence that "gives rise to serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim" for us to apply the less deferential standard. *Layes [v. Mead Corp.],* 132 F.3d [1246,]

1250 [ (8th Cir.1998) ] (internal quotation marks omitted).

*Shelton,* 285 F.3d at 642. The court finds that it need not consider application of this "less deferential" standard of review until it determines whether or not the Munsens' claim fails under the more typical "deferential" standard of review. *See Brant,* 195 F.Supp.2d at 1108–09 (describing the "ordinary" deferential standard of review for "abuse of discretion").

### c. *Review of interpretations of plan terms*

■ On the other hand, whether or not an administrator has properly *interpreted the terms of the plan* is subject to a different test of reasonableness. *See Brant,* 195 F.Supp.2d at 1109 n. 1; *West,* 171 F.Supp.2d at 866 & 867–70 (discussing the frequent "blurring" by parties and courts of the distinctions between the administrator's determination of facts and interpretation of plan terms and the standard of review applicable to each). The test of the "reasonableness" of the administrator's interpretation of the terms of the plan requires the court to consider the following five factors: (1) whether the administrator's interpretation is consistent with the goals of the Plan; (2) whether the interpretation renders any language in the Plan meaningless or internally inconsistent; (3) whether the administrator's interpretation conflicts with the substantive procedural requirements of the ERISA statute; (4) whether the administrator has interpreted the relevant terms consistently; and (5) whether the interpretation is contrary to the clear language of the Plan. *Brant,* 195 F.Supp.2d at 1109 n. 1 (citing *Shelton,* 285 F.3d at 642); *West,* 171 F.Supp.2d at 866 (citing *Farley v. Arkansas Blue Cross & Blue Shield,* 147 F.3d 774, 777 n. 6 (8th Cir.1998), and *Finley v. Special Agents Mut. Ben. Ass'n, Inc.,* 957 F.2d 617, 621 (8th Cir.1992)); *and compare Shelton,* 285

F.3d at 642 (describing these factors as applicable "[i]n determining whether the administrator's *decision* constituted an abuse of discretion," but then applying them to the administrator's *interpretation* of plan terms) (emphasis added), *with Ferrari v. Teachers Ins. & Annuity Ass'n,* 278 F.3d 801, 808 (8th Cir.2002) (describing these factors as applicable "in determining whether a plan decision-maker's *interpretation* of the plan, which leads to denial of a claim, is reasonable," and accepting as correct the district court's application of these factors in analyzing the reasonableness of the administrator's interpretation of plan language) (emphasis added).[5] Thus, in this case, these factors are applicable to the "reasonableness" of Wellmark's *interpretation* of such terms in the Benefits Certificate as "homebound" and "custodial care," to the extent that the interpretations of such terms are in dispute. *Cf. West,* 171 F.Supp.2d at 870 (distinguishing in that case between issues of interpretation by the administrator, to which the "five-factor test" applied, and factual determinations, to which the "substantial evidence" standard applied).

### 2. *Wellmark's interpretation of pertinent plan terms*

Logically, before the court can determine whether there was "substantial evidence" to support Wellmark's determination to discontinue paying for private duty nursing services for Maxwell under the terms of the Benefits Certificate, the court must first determine whether Wellmark's interpretation of pertinent terms in the Benefits Certificate was "reasonable." As mentioned above, the provision of the Benefits Certificate providing for private duty nursing benefits requires, *inter alia,* that the patient be "homebound," *see* Plaintiffs'

Exhibit 1, Benefits Certificate, at 14, and it was Wellmark's determination that Maxwell was no longer "homebound." This provision also requires that the care in question be provided "by a registered nurse (R.N.) or a licensed practical nurse (L.P.N.)." *See id.* Wellmark contends that, by virtue of the definition of "custodial care" in the Benefits Certificate, as explained more fully below, private duty nursing services are distinguished from "custodial care," which is "not a benefit under this certificate," *see id.* at 48–49, and in Wellmark's opinion, Maxwell was only receiving "custodial care." Therefore, pertinent terms, in light of the Benefits Certificate and Wellmark's justifications for discontinuing benefits for private duty nursing, include "homebound" and "custodial care." In addition, Wellmark contends that the term "medical necessity" is also pertinent to its determination in this case.

#### a. *"Homebound"*

■ The first question with regard to the reasonableness of Wellmark's interpretation of "homebound" is just what definition for that term Wellmark was using. The Benefits Certificate defined "homebound" as follows:

> **Homebound** means that, due to a physical or mental disability, you are unable to leave home other than for the purpose of obtaining medical care.

Plaintiffs' Exhibit A, Benefits Certificate, at 50 (glossary definition). On the other hand, the definition from the on-line glossary on Wellmark's web page is considerably different. It states the following:

> **Homebound.** Someone who is unable to leave home at all, or without considerable or taxing effort.

---

**5.** This court notes that the factors themselves are always cast in terms of the administrator's "interpretation," not the administrator's "determination." *See Shelton,* 285 F.3d at 642 (casting the factors in these terms); *Ferrari,* 278 F.3d at 808 n. 4 (same).

Defendant's Summary Of Pertinent Benefits Certificate Provisions. This second definition is distinctly less restrictive than the definition in the Benefits Certificate. It is also the definition that Barb Heikes sent to the Munsens, representing that it was the definition at issue in her determination that Maxwell was not "homebound," and the definition that Ms. Heikes stated at trial that she had used in her determination in this case.

Wellmark contends that there is now no issue as to the applicable definition of "homebound." Wellmark has conceded that the applicable definition of that term was the one provided in Wellmark's on-line glossary, not the one stated in the "hard copy" of the Munsens' Benefits Certificate, because the on-line definition had superseded all prior definitions in printed Benefits Certificates. However, the court finds that this concession, at best, eliminates only certain facets of the issues of what definition of "homebound" Wellmark was using and whether Wellmark's interpretation of "homebound" was reasonable.

For example, Dr. Andringa, who was responsible for the first appeal determination by Wellmark, initially testified at trial that he had concluded that Maxwell was not "homebound," "[b]ecause of his ability to leave the home for periods of time." Real Time Transcript, Day 2, at p. 15, *ll.* 22–23. Thus, it appears that, in the first instance, Dr. Andringa's definition of "homebound" meant someone who was unable to leave home at all or for any period of time. Of course, this definition appears nowhere in either the Benefits Certificate or in the on-line glossary, and constitutes a *third* definition of "homebound" apparently employed by Wellmark. When asked by defendant's counsel to cast his explanation in terms of the on-line definition that Wellmark had elsewhere conceded was applicable, Dr. Andringa testified that he believed "considerable and taxing effort" involved consideration of the time and ef-

fort involved in allowing a beneficiary to leave the home. *See id.* at p. 15, *ll.* 6–16. However, Dr. Andringa did not then explain that he had actually used this definition to make his appeal determination in the Munsens' case. *See id.*

The question of what definition Dr. Andringa actually used only became more unclear as both Wellmark's and the Munsens' counsel elicited further testimony from him. When the Munsens' counsel asked, "Where did you find the definition for homebound?," Dr. Andringa answered, "There is a benefit language certificate." *Id.* at p. 20, *ll.* 17–19. Dr. Andringa was then asked to read the definition in the Benefits Certificate, Plaintiffs' Exhibit 1, and he confirmed that that was the definition he had used. *See id.* at p. 20, *ll.* 16–24. However, Wellmark had conceded that the definition of "homebound" in the Munsens' Benefits Certificate had been superseded by the on-line definition. When asked what he knew about the "effort" that had to be made by the Munsens to take Maxwell out of the home, which refers to the on-line definition of "homebound," Dr. Andringa testified that he knew "[o]nly that [Maxwell] was able to leave the home to the degree that he was," *see id.* at p. 22, *ll.* 5–8, which seems to the court to harken back to Dr. Andringa's personal definition of "homebound" entirely in terms of whether the beneficiary can leave the home at all. The Munsens' counsel then elicited testimony from Dr. Andringa in an attempt to clarify his definition of "homebound," which suggested that Dr. Andringa considered whether or not someone was "homebound" to be a matter of "degrees," based on how much of an "outing" was involved, apparently without regard to how much "effort" was involved in making the "outing." *See id.* at p. 22, *l.* 11 to p. 23, *l.* 23. On redirect examination by Wellmark's counsel, however, Dr. Andringa agreed with Wellmark's counsel that he

had previously testified, on direct examination, that the definition he had used in the appeal before him was the definition cast in terms of "considerable or taxing effort." *See id.* at p. 33, *ll.* 20–25. He explained, further, that he had actually been shown a "glossary" definition, apparently from the on-line glossary, not the Benefits Certificate, but he then testified, "I'm not sure that I actually looked up a definition at that time," although he thought that the definition that was "in his head" was the one cast in terms of "considerable or taxing effort." *See id.* at p. 34, *ll.* 1–17. On re-cross-examination, he also testified that "[t]ypically, we would not" look up the definition of "homebound" in the course of reviewing a denial of benefits. *See id.* at p. 36, *ll.* 4–8. Dr. Andringa then attempted to clarify this statement, as follows:

A. You said the definition; okay? I did refer to the benefit certificate language.

Q. Very good.

A. Okay. You referenced the glossary. I looked at the actual language.

*Id.* at p. 36, *ll.* 12–16. This testimony, again, suggests that the definition that Dr. Andringa "looked at," if indeed he looked at any definition at all, was the one in the Benefits Certificate.

In short, the court finds that Dr. Andringa does not have the least idea what definition, if any, he may have looked at or applied in determining whether or not Maxwell was "homebound." Under the circumstances, the court is entitled to find that Dr. Andringa used one of the "wrong" definitions, either the superseded definition in the Benefits Certificate or his personal definition in terms of ability to leave the home at all or for any period of time.

Moreover, there is absolutely no evidence concerning what definition of "homebound," if any, Dr. Spurgeon may have reviewed or applied when he made the second appeal determination. Indeed, his

e-mail to Mr. Van Dyke conveying a summary of his decision does not refer to a "homebound" requirement at all. Instead, Dr. Spurgeon stated, "I have reviewed the file and agree that the care at [the] present time is custodial." Defendant's Exhibit G–1, (e-mail of November 20, 2002, 4:00 p.m., from Spurgeon to Van Dyke). Only the letter purportedly conveying Dr. Spurgeon's determination to the Munsens' counsel, which was actually authored by Mr. Van Dyke, referred to reaffirmance of the denial of benefits on the ground that Maxwell was not "homebound," *see* Defendant's Exhibit H–1; there is no other evidence that Dr. Spurgeon ever offered any such ground for denial of benefits.

In light of this court's findings that Wellmark has conceded that the definition that its representatives purportedly were or should have been using for "homebound" is the on-line glossary definition, *i.e.*, the "considerable or taxing effort" definition, that Ms. Heikes purported to have used that definition, that Dr. Andringa used either of two "wrong" definitions, and that Dr. Spurgeon used no definition, the court must find that the applicable definition of "homebound" in this case is the "on-line" definition, which is the least restrictive definition: "Someone who is unable to leave home at all, or without considerable or taxing effort." Defendant's Summary Of Pertinent Benefits Certificate Provisions.

There are issues that must still be resolved concerning the "reasonableness" of Wellmark's interpretation of the definition that the court has now found to be applicable here. The court believes that it fairly summarizes Wellmark's interpretation to be that "someone's" "ability" to leave home, or the "effort" involved in doing so, must be gauged in terms of the availability of sufficiently mobile equipment and caregivers to assist that "someone," apparently

without regard to the effort required from those caregivers. For example, Barb Heikes testified that someone is not "homebound" if that person can leave the home with equipment and caregivers that are available to that person. The court also believes that it fairly summarizes the Munsens' interpretation to be that where "someone" could not leave the home under any circumstances without the assistance of equipment and/or other persons, it is the "effort" of caregivers involved in getting "someone" out of the home that must be considered in determining whether that "someone" is "homebound."

The court finds that Wellmark's interpretation of "homebound" is not reasonable under the five-factor test. *See, e.g., Shelton,* 285 F.3d at 642. First, it cannot be "consistent with the goals of the Plan"—which is designed to provide medically necessary benefits, generally, and, more specifically, to provide private duty nursing provided by a R.N. or L.P.N. to a "homebound" beneficiary where prescribed by a practitioner for treatment of an illness or injury, *see* Plaintiffs' Exhibit 1, Benefits Certificate, at 14 (provision for private duty nursing)—to rely on an interpretation of "homebound" that does not even include dead people, who, although patently unable to leave the home via their own efforts, can leave home with the assistance of equipment and other people. Wellmark's counsel was unable to identify any persuasive example of a person who would be "homebound" under Wellmark's interpretation. Instead, Wellmark offered as an example of a truly "homebound" person one who required a mechanical ventilator in order to breathe, but the court notes, after a brief search of the Internet, that mobile mechanical ventilators are also available, including units mounted on strollers for children dependent upon such devices. It cannot be consistent with the goals of the plan to bar beneficiaries who have no ability to leave the home themselves from resorting to the assistance of either equipment or other persons, however taxing the efforts required of those other persons might be, if the beneficiaries are to maintain their status as "homebound." Similarly, Wellmark's interpretation "renders [some] language in the Plan meaningless or internally inconsistent," *see Shelton,* 285 F.3d at 642 (second factor), because it renders the express requirements of a practitioner's prescription and the provision of care by a licensed nurse essentially meaningless, as such requirements are "trumped" by the scope of Wellmark's "silent" exclusion based on availability of equipment and caregivers. Indeed, if there is no one who is "homebound" under Wellmark's interpretation, the availability of private duty nursing services under the Benefits Certificate is illusory, and the provision in its entirety is therefore meaningless. *See, e.g., Wilson v. Prudential Ins. Co. of Am.,* 97 F.3d 1010, 1013 (8th Cir.1996) ("We must construe each provision consistently with the others and as part of an integrated whole so as to render none of them nugatory and to avoid illusory promises."). Although it does not appear that Wellmark's interpretation conflicts with the substantive procedural requirements of the ERISA statute, *see Shelton,* 285 F.3d at 642 (third factor), other factors in the five-factor test are pertinent here. In light of the discussion above concerning what definition of "homebound" was even at issue, it is readily apparent that Wellmark has interpreted the relevant term inconsistently, *see id.* (fourth factor), not just from time to time, *but in this case.* Finally, Wellmark's interpretation is "contrary to the clear language of the Plan," *see id.* (fifth factor), because it reads the "considerable or taxing effort" language completely out of the definition, if no amount of effort on the part of the beneficiary will allow him or her to leave home,

and the effort of caregivers, who might somehow be able to effect an "outing" for the beneficiary, is completely irrelevant.

Therefore, the court concludes that Wellmark's interpretation is *not* "reasonable" and cannot be used as the basis for review of whether there was "substantial evidence" to support Wellmark's conclusion that Maxwell was not "homebound." Instead, a reasonable interpretation of "homebound," under the definition that Wellmark concedes is applicable here, must consider the effort required of caregivers to allow the beneficiary to leave the home.

### b. "Custodial care"

 In the Benefits Certificate, "custodial care" is defined, and then excluded from coverage, as follows:

> **Custodial Care** helps you meet your daily living activities. This type of care does not require the continuing attention and assistance of licensed medical or trained paramedical personnel. Some examples of custodial care are assistance in walking and getting in and out of bed; aid in bathing, dressing, feeding, and other forms of assistance with normal bodily functions; preparation of special diets; and supervision of medication that can usually be self-administered. Custodial care is not a benefit under this certificate.

Plaintiffs' Exhibit A, Benefits Certificate, at 48–49. The court cannot find that the Munsens have ever disputed Wellmark's "interpretation" of "custodial care," although they have certainly disputed Wellmark's factual determination that Maxwell only required such care, and, indeed, the relevance of any "custodial care" justification to the denial of private duty nursing benefits in this case. Nevertheless, assuming that the "custodial care" determination is worthy of consideration, in order to determine whether there is "substantial

evidence" to support it, the court must ascertain what interpretation of "custodial care" Wellmark was using.

The only decision-maker from Wellmark to consider whether Maxwell was receiving only "custodial care" was Dr. Spurgeon, but the record is devoid of any evidence of his "interpretation" of that benefits limitation. On the other hand, it is clear from the exchange of e-mails between Dr. Spurgeon and Mr. Van Dyke that Mr. Van Dyke considered the question of whether a beneficiary was receiving "skilled" or merely "custodial care" to be "a medical necessity determination under the applicable medical necessity provision of Maxwell's benefit certificate." Defendant's Exhibit G–2 (e-mail of November 7, 2002, from Van Dyke to Spurgeon). It also appears, from the e-mails between Dr. Spurgeon and Mr. Van Dyke, that Wellmark, or at least these two representatives of Wellmark, interpreted the custodial care exclusion to exclude benefits for private duty nursing if the services that the private duty nurse would provide did not, in fact, require "skilled" care. *See* Defendant's Exhibit G–2 (e-mail of November 7, 2002, from Van Dyke to Spurgeon, in which Van Dyke poses the question "is Maxwell receiving skilled care or custodial care?"); *id.* (e-mail of November 20, 2002, 4:00 p.m., from Spurgeon to Van Dyke, in which Spurgeon opines that "the care at [the] present time is custodial"). The court will also take the specific examples of "custodial care" given in the third sentence of the definition as indicators of Wellmark's interpretation of the specific kinds of care that constitute only "custodial care," which is otherwise defined in the first two sentences of the definition, quoted above. *Id.*

The court can find nothing "unreasonable," under the five-factor test, *see Shelton*, 285 F.3d at 642, or otherwise, about

the specific examples of "custodial care" as indicative of the interpretation of that term. The court also finds nothing "unreasonable" about interpreting a custodial care exclusion as consistent with or part of a medical necessity requirement. Indeed, such an interpretation of "custodial care," defined as "[c]are [that] helps you meet your daily living activities" and that "does not require the continuing attention and assistance of licensed medical or trained paramedical personnel," is consistent with the definition of "medical necessity," which requires, *inter alia,* that care be "[a]ppropriate and necessary for the symptoms, diagnosis, and direct care or treatment of your illness or injury" and "[n]ot primarily for your convenience or the convenience of your provider." *See* Plaintiffs' Exhibit 1, Benefits Certificate, at 9. The difficulty the court finds is with an interpretation of the custodial care exclusion as "trumping" the specific qualifications for private duty nursing benefits under the Benefits Certificate.

Interpreting the custodial care exclusion as "trumping" the express requirements for private duty nursing benefits "renders [some] language in the Plan meaningless or internally inconsistent" and is "contrary to the clear language of the Plan." *See Shelton,* 285 F.3d at 642 (second and fifth factors of the five-factor test). While the custodial care exclusion excludes coverage for "care [that] *does not require* the continuing attention and assistance of licensed medical or trained paramedical personnel," *see* Plaintiffs' Exhibit 1, Benefits Certificate, at 48–49 (emphasis added), the private duty nursing benefits provision does not state that the care *must require* the services of a licensed nurse. Instead, the private duty nursing benefits provision requires, in pertinent part, that the "[s]ervices *are provided* in your home by a registered nurse (R.N.) or a licensed practical nurse (L.P.N.)" and *"are prescribed by* a practitioner for the treatment of ill-

ness or injury when you are homebound." Plaintiffs' Exhibit 1, Benefits Certificate, at 14 (emphasis added). Thus, under Wellmark's interpretation, even if the qualifications for private duty nursing benefits are met, because a practitioner has prescribed certain services, and those services are, in fact, provided by a licensed nurse to a homebound beneficiary, if the services in question do not *require* a licensed nurse, private duty nursing benefits would still be barred by the custodial care exclusion. The Eighth Circuit Court of Appeals has observed that the issue of interpretation of an ERISA plan is " 'simply one of contract interpretation.' " *Jacobs v. Pickands Mather & Co.,* 933 F.2d 652, 657 (8th Cir.1991) (quoting *Harper v. R.H. Macy & Co.,* 920 F.2d 544, 545 (8th Cir.1990), in turn quoting *Anderson v. Alpha Portland Indus., Inc.,* 836 F.2d 1512, 1516 (8th Cir.1988)). As a matter of contract interpretation, "specific terms and exact terms are given greater weight than general language." RESTATEMENT (SECOND) OF CONTRACTS, § 203(c). In this case, the specific terms regarding qualification for benefits for private duty nursing necessarily govern over language of a general exclusion for "custodial care." To put it another way, the specific requirements for private duty nursing in the Benefits Certificate *establish* that the care is not merely "custodial." This interpretation harmonizes the specific private duty nursing benefits provision with the general custodial care exclusion; Wellmark's reading of the scope of the custodial care exclusion as "trumping" the express qualifications for private duty nursing benefits, on the other hand, does not.

Therefore, the court concludes that, if the qualifications for private duty nursing benefits are otherwise met, the benefits cannot be excluded under the custodial care exclusion on the ground that the services do not *require* a licensed nurse.

Wellmark's contrary interpretation is not "reasonable."

### c. "Medical necessity"

Wellmark also contends that "medical necessity" is a requirement for benefits under the Benefits Certificate that was always "at play" in the determination that Maxwell was not entitled to private duty nursing services, even if it was not expressly relied upon. Dr. Andringa testified that the reliance on a determination that Maxwell was not "homebound" encompassed a facet of "medical necessity." Similarly, as mentioned above, it is clear from the exchange of e-mails between Dr. Spurgeon and Mr. Van Dyke that Mr. Van Dyke considered the question of whether a beneficiary was receiving "skilled" or merely "custodial care" to be "a medical necessity determination under the applicable medical necessity provision of Maxwell's benefit certificate." Defendant's Exhibit G–2 (e-mail of November 7, 2002, from Van Dyke to Spurgeon).

It is true that the Benefits Certificate states, in a section entitled "Important Information," that "[a]ll services must be medically necessary." Plaintiffs' Exhibit 1, Benefits Certificate, at 9. The pertinent provision continues with the following definition of "medical necessity":

Unless otherwise required by law, we decide what is medically necessary and our decision is final and conclusive. Medically necessary means that a procedure, service or supply is all of the following:

- Appropriate and necessary for the symptoms, diagnosis, and direct care or treatment of your illness or injury.
- Consistent with professionally recognized standards of health care and given at the right time and in the right setting.
- Not primarily for your convenience or the convenience of your provider.

- The most appropriate supply or level of service or supplies that can safely be provided.
- Enables you to make reasonable progress in treatment.

There may be alternative procedures, services, or supplies that meet medical necessity criteria for the diagnosis and treatment of your condition. If the alternatives are substantially equal in clinical effectiveness and use similar therapeutic agents or regimens, we reserve the right to approve the least costly alternative.

Plaintiffs' Exhibit 1, Benefits Certificate, at 9.

The Munsens contend that reliance on "medical necessity" is only a *post hoc* and untimely asserted ground for denial of private duty nursing benefits, and that the court need not consider that justification at all. For reasons set forth in the court's analysis of "substantial evidence," at section II.A.3.b.ii., beginning on page 45, below, the court agrees with the Munsens that Wellmark's reliance on "medical necessity" is not well taken in this case and that it will therefore not be considered by the court as justification for Wellmark's benefits decision in this case.

### d. "Medical stability" and "medical fragility"

Wellmark also elicited testimony from numerous witnesses, including expert opinions, that Maxwell is now "medically stable," apparently in response to the August 2, 2002, letter from two of Maxwell's providers at Children's Hospital in Omaha, Nebraska, Diana Lundquist, PA–C, and Gary Lerner, M.D., which described Maxwell as "medically fragile." *See* Plaintiffs' Exhibit 3 (page 1, second unnumbered paragraph). However, Wellmark pointed to no provision of the Benefits Certificate that makes private duty nursing services

contingent upon the beneficiary being "medically fragile" or *not being* "medically stable." Indeed, Wellmark did not point to any provision of the Benefits Certificate that uses either "medically stable" or "medically fragile," or any variant thereof. To the extent that the testimony concerning "medical stability" or "medical fragility" is intended to support Wellmark's conclusion that Maxwell was receiving only "custodial care," and therefore, did not qualify for private duty nursing under the terms of the Benefit Certificate, that evidence may go to whether or not there is "substantial evidence" supporting Wellmark's denial of private duty nursing benefits. However, the terms do not appear to the court to have any particular significance in that context, either, because the pertinent inquiries to determine qualification for private duty nursing benefits are established by the "private duty nursing" provision of the Benefits Certificate.

### 3. *Substantial evidence*

Now that the appropriate interpretations of critical plan terms have been established, the court turns to the question of whether Wellmark's factual determination that Maxwell was not entitled to benefits for private duty nursing was supported by "substantial evidence." *Norris*, 308 F.3d at 883–84 ("A plan administrator's fact-based disability decision is reasonable if it is supported by 'substantial evidence.' "); *Jackson*, 303 F.3d at 887.

### a. The *"not homebound" determination*

*i. Arguments of the parties.* The Munsens argue that Wellmark's determination that Maxwell was "no longer homebound" was not supported by substantial evidence for a number of reasons. They point out that private duty nursing was and is prescribed by Maxwell's physicians, and that the private duty nursing services had been provided by R.N.s and L.P.N.s,

so that the only requirement for private duty nursing benefits under the Benefits Certificate that could be at issue is whether or not Maxwell was "homebound." They also point out that the only justification offered for denial of private duty nursing benefits up until the second appeal determination was that Maxwell was "not homebound," so that only that determination is properly before the court.

As to whether or not Maxwell is "homebound," the Munsens argue that Maxwell cannot leave home at all under his own power, but can only do so in complete dependence upon equipment and caregivers. Specifically, Maxwell can only leave home in his wheelchair, and only with a large amount of medical supplies and the assistance of two adults, one to drive the vehicle and another to monitor his condition. The Munsens point to letters from his providers, Plaintiffs' Exhibit 3, and his August 27, 2001 School Health Plan, Plaintiffs' Exhibit 11, which were also provided to Wellmark, as demonstrating the extent of the equipment, supplies, and effort required to take Maxwell out of the home and Wellmark's knowledge of these requirements. In short, they contend that, by any reasonable definition of "considerable or taxing effort," Maxwell is "homebound." They also point out that, shortly before Wellmark decided to terminate private duty nursing benefits, Wellmark had reaffirmed that Maxwell was still "homebound" despite his attendance at school three mornings a week.

In response, Wellmark argues that it had before its decision-makers evidence that Maxwell can, and frequently does, leave home for other than medical care or school. This argument, of course, suggests consideration of the "homebound" question under the "wrong" definition, the superseded definition in the Benefits Certificate. However, Wellmark also argues

that the frequency of Maxwell's "outings" demonstrates that there is no "considerable or taxing effort" involved in taking Maxwell out of the house, which shows reliance on the proper definition of "homebound" in the on-line glossary. Moreover, at trial, Wellmark asserted that Maxwell's ability to leave the home had been enhanced by available equipment and the skill of his parents, so that neither "considerable" nor "taxing" effort is involved any longer in taking Maxwell out of the home. Wellmark also relies on Melissa's testimony that it "only" takes about fifteen minutes to get Maxwell off to school or off on an outing.

 *ii. Analysis.* Although the court finds that there was a "scintilla" of evidence supporting Wellmark's determination that Maxwell was not homebound, there is nothing more than that, and, furthermore, considering both the quality and quantity of the evidence that Wellmark had before it—had its decision-makers chosen to look—the court cannot see how a reasonable person could have reached a similar decision. *See Brant,* 195 F.Supp.2d at 1108–09 (summarizing the applicable standards); *accord Norris,* 308 F.3d at 883–84; *Jackson,* 303 F.3d at 887. Indeed, Wellmark's explanation for its decision falls well short of being "reasoned" or "based on the evidence" reasonably known to its decision-makers. *Id.*

Although Barb Heikes may have identified fourteen "outings" by Maxwell from March 2002 through July 2002—including a family vacation to the Black Hills in July 2002 without a private duty nurse—the court finds that she almost completely ignored the evidence of the nature of those "outings" and, more importantly, the "effort" on the part of the Munsens required to make them, which is the critical element of the applicable definition of "homebound." *See* Defendant's Summary Of Pertinent Benefits Certificate Provisions,

Wellmark's On–Line Glossary definition of "homebound" ("**Homebound.** Someone who is unable to leave home at all, or without considerable or taxing effort."). Some of the "outings" relied upon by Ms. Heikes involved activities as close to home as Maxwell sitting on the porch or playing with his father on a swing and slide in the Munsens' own yard. The court cannot find that these "outings" constituted "leaving the home," or that it was reasonable for Wellmark to categorize them as such, where Maxwell was no further away from his "homebase" of equipment and skilled caregivers than someone who lived in a bigger house might have been. Surely it would smack of absurdity to argue that, at some point, a beneficiary's house was so big, that if the beneficiary was carried into certain rooms, the beneficiary would no longer be "homebound"? Even supposing that these "outings" might somehow fit a hypertechnical definition of "leaving the home," the court finds that they could only be undertaken because of the immediate proximity of the "homebase" of equipment and skilled care, and so, the considerable effort in making those necessities available for Maxwell so that he could go outside means that he remained "homebound," even if he was outside of the physical limits of the house.

The evidence of "outings" further afield also demonstrates the unreasonableness of Wellmark's determination—in terms of "quantity" and "quality" of evidence, *see Brant,* 195 F.Supp.2d at 1108–09—because the record shows that Barb Heikes and Dr. Andringa either made no effort to investigate or completely ignored evidence before them of the amount of "effort" required to undertake those "outings." Although Barb Heikes professed herself to be aware of the "go bags" that Melissa pointed out standing ready by the door, she failed to consider, or even to ask Melissa about, the amount of effort and plan-

ning that went into having those "go bags" ready to go whenever needed for emergencies, and what other effort or preparation was required for a planned outing. Although Wellmark relies on Melissa's testimony that it "only" took about fifteen minutes to get Maxwell out the door for an outing, Wellmark ignores the caveat in Melissa's testimony that the fifteen minutes was the amount of time required to load Maxwell into a vehicle *if everything required for the outing was already prepared.* Thus, Wellmark's focus on the "fifteen minutes" ignores the evidence before it of the considerable effort required to make sure that all equipment and back-up equipment is clean, working, and ready to load, and that all necessary supplies and medications, for routine care or emergencies, is also packed and ready, as well as the effort required after any outing to unload all the equipment and supplies, and clean, put away, or replenish them, as necessary. Some evidence on this point was plainly available to Wellmark at the time of Dr. Andringa's review, *see Shelton,* 285 F.3d at 642 ("a reviewing court should consider only the evidence before the plan administrator when the claim was denied"), because one of the "provider" letters that the Munsens attached to their first letter appealing the discontinuation of private duty nursing benefits, the letter from Ms. Lundquist, P.A., and Dr. Lerner, included the following:

> Max requires an extensive amount of equipment and supplies to be taken out of the home. This includes, at the least, his wheelchair and a van with a wheelchair lift/ramp or a carseat if there is

not a van. In the case of the carseat, he must be lifted out of his wheelchair into the carseat, and the wheelchair must be folded down to fit in the car. Anywhere he goes he must have extra tracheostomy tubes, bag-mask, suction machine, suction supplies (catheter, tips, gloves, etc), pulse oximeter, possibly oxygen, medications, formula, gastrostomy button supplies (syringe, feeding tube, decompression tube, water to flush tube, etc) diapers, and Diastat. Two people (with at least one trained in his care) are needed to take him anywhere because one person needs to monitor him while the other drives. It takes a significant amount of energy and planning to take Max out of his home, even for a brief activity.

Plaintiffs' Exhibit 3 (letter of August 22, 2002, from Lundquist, P.A., and Lerner, M.D., of Children's Hospital). The defendant's expert witness, Dr. Bartlett, testified that, while there was no "taxing effort" on Maxwell's part in an outing, "[t]he taxing effort is to the family in transporting his supplies that were needed." Videotape Deposition of Dr. Bartlett, Transcript at p. 22, *ll.* 15–25.[6] Also, even though the Munsens were able to take a family vacation without a private duty nurse in the entourage, the evidence before Wellmark, whether Wellmark chose to see it or not, was that *both* of the skilled caregivers in the family, Steve and Melissa, were available every moment of every day during the trip to provide necessary care, which is not the case when they are at home and

6. Although Dr. Bartlett offered his expert opinion that Maxwell was not "homebound," his testimony was that "if you define homebound as not being able to leave the home, he doesn't fit that definition." Videotape Deposition of Dr. Bartlett, Transcript at p. 23, *ll.* 5–7. The definition upon which Dr. Bartlett's expert opinion is based, however, is not the

definition that the court has held is applicable here, but sounds ominously like Dr. Andringa's equally mistaken definition of "homebound" as able to leave the home at all or for any period of time. In any event, Dr. Bartlett's opinion is *post hoc,* as he was not involved in Wellmark's benefits determination.

Steve is working full-time outside of the home.

In short, it appears to the court that Wellmark, perhaps inadvertently, but no less effectively, penalized the Munsens for "getting good" at taking care of their son's needs, without ever properly considering—or considering at all—the amount of effort required on their part to "get good" at it, or even the amount of effort required once they *were* "good at it." The court agrees with the Munsens that, whatever reasonable definition of "considerable or taxing effort" is used, the amount of effort involved in taking Maxwell out of the home for any purpose meets that definition and, based on the quantity and quality of the evidence, the court does not see how any reasonable person could reach a contrary conclusion. *See Brant,* 195 F.Supp.2d at 1108–09 (standards for determining the "reasonableness" of an administrator's factual determination under "abuse of discretion" review).

Finally, the court cannot condone a "review" of qualification for benefits that hides the fact of the review until the determination is sprung upon the beneficiary. The court finds that, although Ms. Heikes may have been "reviewing" Maxwell's qualification for private duty nursing benefits from June 2002 until August 2002, she made no effort to inform the Munsens that she was doing so, or, even more critically, to obtain from them information about the "effort" involved in taking Maxwell out of the home, where they were undoubtedly the best source of such information, and such information was clearly pertinent to the question *under the applicable definition of "homebound."* Indeed, Ms. Heikes did not inform the Munsens of her doubts that Maxwell was "homebound" until just before sending the Munsens the first notice of a reduction in private duty nursing hours on August 2, 2002. Any reasonable or meaningful review, in light of the applicable definition of "homebound," would

doubtless have involved actually talking to the Munsens about the "effort" required for an "outing" or actually observing the process to prepare for, undertake, or return from an "outing." Barb Heikes testified that she visited the Munsens' home for approximately one to one-and-a-half hours, but her testimony indicated that during that time, no efforts were being made to get Maxwell ready to go to school or to depart on or to return from any "outing." Although the court must "consider only the evidence before the plan administrator when the claim was denied," *Shelton,* 285 F.3d at 642, the court cannot read this requirement to tolerate a plan administrator "closing its eyes" to evidence, making sure that evidence that did not support the desired conclusion was never before it, or failing to acquire information that was undoubtedly relevant under the applicable standards for certain benefits and reasonably available. Indeed, the failure of Wellmark's representatives to gather or review pertinent information about the amount of "effort" required to make an outing possible for Maxwell is circumstantial evidence from which the court believes it is justified in finding that Wellmark was not applying, or was not "reasonably" applying, the proper definition of "homebound," which plainly depends upon the amount of "effort" involved in an outing.

Dr. Andringa's appeal determination, also based on a conclusion that Maxwell was "no longer homebound," is even more deficient. Even assuming that Dr. Andringa applied the correct definition of "homebound"—and the court finds that he did not—the evidence upon which Dr. Andringa relied to reach that conclusion was even skimpier and more slanted than the evidence upon which Ms. Heikes had relied in making the original determination. *See Brant,* 195 F.Supp.2d at 1108–09 ("abuse of discretion" review of factual determina-

tions depends upon both the quality and quantity of evidence). Dr. Andringa testified that he did *not* review the entire nursing record or talk to the Munsens. Instead, he relied on a summary of the nursing record prepared by Barb Heikes, whose decision he was purportedly reviewing, and discussed the case with her. The court will not stand for the proposition that there is more than a "scintilla" of evidence supporting a determination, where only a "scintilla" of the pertinent information, and a one-sided view at that, is ever put before the supposed decision-maker. Although Dr. Andringa testified that he reviewed the letters from providers attached to the Munsens appeal and that he believed that he was aware of a list of items that the Munsens needed to take along if they took Maxwell out of the home, there is no evidence that he gave any reasonable consideration to the implications of that evidence, where the focus of his determination, based on his trial testimony, was on whether Maxwell could leave home at all.

Wellmark's determination that Maxwell was "no longer homebound" is *not* supported by "substantial evidence," and therefore, the denial of private duty nursing benefits cannot stand on that ground.

### b. The "custodial care"/"medical necessity" determination

### i. Arguments of the parties. The Munsens argue, in the first instance, that the court should not consider any ground for Wellmark's denial of private duty nursing benefits other than Wellmark's "no longer homebound" justification, because, on the record presented, any other reason for the denial was a *post hoc* justification not actually relied upon at the time that the decision to terminate private duty nursing benefits was made. Wellmark, on the other hand, argues that "medical necessity," specifically in terms of whether or not Maxwell was only receiving "custodial

care," was "always at play" in the determination process, and that the Munsens knew or should have known that. Wellmark argues that the specific reliance on "custodial care" in the second appeal determination was only a clarification of Wellmark's grounds, not a wholly new, and certainly not a pretextual, basis for its determination to deny further private duty nursing benefits.

If the court deems it appropriate to consider Wellmark's "custodial care" justification for denying private duty nursing benefits, the Munsens argue that there is not "substantial evidence" supporting a determination that Maxwell was only receiving "custodial care." Instead, they point to the continued insistence of Maxwell's medical providers on private duty nursing services; Maxwell's continued reliance upon a tracheostomy to breathe and the attendant requirements for licensed nursing care to manage his trach tube, either "routinely" or in an emergency; and the permanent or chronic nature of even his currently "stable," but still potentially life-threatening conditions. They argue that, while Wellmark contends that properly trained laypersons, besides Maxwell's family members, could also provide adequate care, Wellmark has failed to identify any "pool" of such qualified caregivers. Finally, they argue that Maxwell's bout with a bronchial infection after private duty nursing benefits were phased out, which required reinstatement of such benefits during December 2002 and January 2003, demonstrates precisely why Maxwell requires skilled nursing care, not merely custodial care. Wellmark, on the other hand, argues that the opinion of Maxwell's primary treating pediatrician, Dr. Rex Rundquist, at most suggests that private duty nursing was "convenient," or "appropriate" for Maxwell, but that Dr. Rundquist could not bring himself to aver that such care was "necessary," and that the opinion of

Dr. Lerner and Ms. Lundquist, P.A., that Maxwell was still "medically fragile" relied, in part, on conditions that had been brought "under control." Wellmark points out, also, that it had before it evidence that all of Maxwell's care had become "routine" and so, private duty nursing was "convenient" for the Munsens, but not "medically necessary"; evidence that the Munsens could provide such care adequately; and evidence from which it was reasonable to believe that other properly trained laypersons could also provide such care.

■ *ii. Analysis.* The court agrees with the Munsens that the custodial care exclusion was only raised as a justification for the denial of private duty nursing benefits in this case during the second appeal to Dr. Spurgeon. Therefore, it formed no part of the justification of the initial benefits determination and cannot justify termination of benefits in August 2002. *See Conley v. Pitney Bowes,* 176 F.3d 1044, 1049 (8th Cir.1999) ("It is true that in reviewing a denial of benefits under an employee welfare plan subject to ERISA, a court must focus on the evidence available to the plan administrators at the time of their decision and may not admit new evidence or consider *post hoc* rationales. *See Marolt v. Alliant Techsystems, Inc.,* 146 F.3d 617, 620 (8th Cir.1998), and *Short v. Central States, Southeast and Southwest Areas Pension Fund,* 729 F.2d 567, 571 (8th Cir.1984). This is so even in the case of *de novo* review unless there is good cause to depart from the general rule, as the trial court itself pointed out. *See, e.g., Donatelli v. Home Insurance Co.,* 992 F.2d 763, 765 (8th Cir.1993)."), *cert. denied,* 528 U.S. 1136, 120 S.Ct. 979, 145 L.Ed.2d 930 (2000). Moreover, the court concludes that the "custodial care" determination cannot be used as an independent justification for terminating benefits in November 2002, as Wellmark argues, because such a termination on that date would not have been pursuant to the regular procedures under the Benefits Certificate and the Munsens were not afforded any opportunity for internal appeal of such a determination.

Even supposing that the court should consider this latter-day justification for a denial of benefits, at all, or as a justification for a termination of private duty nursing benefits *in November 2002,* as Wellmark argues, the court must again conclude that there is at most a "scintilla" of evidence supporting Wellmark's determination that Maxwell was receiving only "custodial care," but not more than that, and, furthermore, considering both the quality and quantity of the evidence that Wellmark had before it—had Wellmark's decision-makers chosen to look—the court cannot see how a reasonable person could have reached a similar decision. *See Brant,* 195 F.Supp.2d at 1108–09 (summarizing the applicable standards); *accord Norris,* 308 F.3d at 883–84; *Jackson,* 303 F.3d at 887. Indeed, Wellmark's "custodial care" explanation for its decision falls well short of being "reasoned" or "based on the evidence" reasonably known to its decision-makers. *Id.*

First, as the court found above, a reasonable interpretation of the Benefits Certificate requires the conclusion that the standards for the "custodial care exclusion" are embodied in the specific qualifications for private duty nursing benefits. Also, as the court explained above, there was not "substantial evidence" for Wellmark's conclusion that Maxwell did not meet the qualifications for private duty nursing services on the only contested qualification, whether or not he was "homebound." Thus, Wellmark's "custodial care"/"medical necessity" conclusion is also not supported by "substantial evidence," where "substantial evidence" that Maxwell did not meet the specific qualifications for private duty nursing is lacking.

Second, and in the alternative, treating the "custodial care exclusion," as separately defined in the Benefits Certificate, as *separate* and *controlling* standards, Wellmark could not reasonably have concluded, based on the evidence before the decision-makers, that the care that Maxwell was receiving from the private duty nurses merely "help[ed][him] meet [his] daily living activities," or was only the "type of care [that] does not require the continuing attention and assistance of licensed medical or trained paramedical personnel," in the sense that all of the care that Maxwell needed was somehow comparable to "assistance in walking and getting in and out of bed; aid in bathing, dressing, feeding, and other forms of assistance with normal bodily functions; preparation of special diets; and supervision of medication that can usually be self-administered." *See* Plaintiffs' Exhibit A, Benefits Certificate, at 48–49. What most sets Maxwell's care apart from such "custodial care," at least since the apparent cessation of major seizure activity, is the care required because of his tracheostomy. The court finds that Wellmark's decision-makers had before them evidence that Maxwell's tracheostomy required suctioning daily, and sometimes several times daily, to deal with ordinary build up of bodily secretions or unusual buildup from illnesses, that skilled care was required to prevent vomiting or reflux from plugging his trach tube, and that if the trach tube became plugged or dislodged, immediate, skilled care was required to prevent Maxwell from suffocating. There simply was not "substantial evidence" to the contrary. Dr. Bartlett, the defendant's expert witness, testified that his opinion—developed long after Wellmark made the benefits de-

termination—was that Maxwell did not need private duty nursing on a full-time basis in August 2002. *See* Videotape Deposition of Dr. Bartlett, Transcript at p. 20, *l.* 12 to p. 22, *l.* 14. However, he also testified that management of the trach tube was possible by a properly trained layperson only "[a]s long as the trach is in place." *Id.* at p. 15, *ll.* 2–9. Dr. Bartlett also testified that, of children in his care at present or in the past, or that he was otherwise aware of, who had conditions otherwise comparable to Maxwell's, none had "trachs," yet some were still institutionalized in the "skilled care" wing of a children's rehabilitation and convalescence home. *See, e.g.,* Videotape Deposition by Dr. Bartlett, Transcript, at p. 24, *l.* 1 to p. 25, *l.* 23. Indeed, one of the examples of why skilled nursing would be required was based on a child with neurological problems who "physically [was] getting bigger" so that the child's family "can't haul her around," and her problems were "to a point where that family couldn't manage it." *Id.* at p. 25, *ll.* 3–12. Dr. Bartlett also testified that a tracheostomy would certainly be a factor to consider in whether skilled care was required, because of the potential for respiratory illnesses complicating care for such a child. *See id.* at p. 26, *ll.* 1–16.[7] Undoubtedly, a substantial portion of Maxwell's care had become "routine," but that still does not amount to "substantial evidence" that the care he was receiving did not require "skilled" care at a level plainly distinct from the examples of "custodial care" listed in the Benefits Certificate. Wellmark's contrary conclusion was not "reasonable," as it was not based on "substantial evidence" in light of the quality and quantity

---

**7.** Dr. Bartlett hedged that he would not actually make a placement determination for a child in either the "skilled" or "intermediate" wing of the children's home, but would instead rely on the evaluation of the child's

needs by staff at the home, even where he ultimately had the responsibility to "sign off" on the prescription of a certain level of care. *Id.* at p. 26, *l.* 24 to p. 28, *l.* 4.

1202

of evidence about the care Maxwell required before Wellmark at the time that the benefits determination was made.

The court holds that Wellmark's denial of benefits for private duty nursing services based on findings that Maxwell required only "custodial care," and therefore, private duty nursing was not "medically necessary," are not supported by "substantial evidence," and therefore, cannot stand. The Munsens are entitled to private duty nursing benefits under the terms of the Benefits Certificate.

### B. Relief

Because the court holds that Wellmark improperly denied private duty nursing benefits in August 2002, and that Maxwell is entitled to such benefits in the future, the court turns to the question of the relief to which the Munsens are entitled. The Munsens pray for both "compensatory" relief, in the sense of compensation for benefits that should have been paid, and injunctive relief enforcing plan terms and restoring such benefits in the future. As mentioned above, section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), provides that "a participant or beneficiary" may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Thus, ERISA appears to authorize both kinds of relief that the Munsens seek.

### 1. Recovery of lost benefits

The Eighth Circuit Court of Appeals has explained that "[m]anifestly included within th[e] authorization [of § 1132(a)(1)(B) ], in our view, is the power for a district court to determine what benefits are due and to award them." *Welsh v. Burlington Northern Inc., Emp. Ben. Plan,* 54 F.3d 1331, 1340 (8th Cir.1995). Prior to Wellmark's improper phasing out and termination of benefits for private duty nursing, Wellmark was providing benefits for 49 hours per week of private duty nursing. Nothing in the record suggests, and Wellmark has not argued, that fewer hours of private duty nursing services should be paid for by the plan if their determination to terminate such benefits is rejected.[8] Similarly, the undisputed evidence is that Wellmark was paying for private duty nursing services at an hourly rate of $39, and no evidence was submitted indicating that a higher or lower hourly rate was appropriate.

However, pursuant to the terms of the Partial Settlement Agreement, the Munsens have agreed to "partially release their claims in the pending Lawsuit for private-duty nursing care to the extent of releasing Wellmark for those periods of time during which *any* private-duty nursing care, regardless of amount, has been provided." Joint Exhibit 1, Partial Settlement Agreement, at ¶ 3 (p. 2 of 4) (emphasis in the original). The Partial Settlement Agreement clarifies that "[t]his would eliminate from the Lawsuit all claims for private-duty nursing care except for the period of time October 28, 2002, through December 2, 2002, during which time no such benefits were provided," and "any time beyond the ending date of the benefits provided [pursuant to the Partial Settlement Agreement]." *Id.* Benefits pursuant to the Partial Settlement

8. The court recognizes that the parties' Partial Settlement Agreement provides for only 28 hours of private duty nursing services per week, but only inappropriate probing into the negotiations leading to that agreement would explain the difference between what Wellmark had been providing under the terms of the Benefits Certificate and what Wellmark was willing to provide to avoid a preliminary injunction or what the Munsens were willing to sacrifice to avoid a fight over a preliminary injunction.

Agreement ended April 13, 2002, so that available relief includes some additional benefits after that date.

The court, therefore, concludes that the Munsens are entitled to recover benefits for 49 hours per week of private duty nursing service from October 28, 2002, through December 2, 2002, at a rate of $39 per hour. This works out to 5 weeks of benefits, or 245 hours at $39 per hour, resulting in a monetary award for lost benefits for that period in the amount of $9,555. In addition, for the period of April 14, 2003, through April 15, 2003, the Munsens are entitled to an additional 14 hours of private duty nursing benefits at $39 per hour, resulting in an additional award of $546 for lost benefits for that period. The total monetary award is, therefore, $10,101.

The Munsens also asked the court to consider whether they are entitled to "compensatory" damages for the loss of Melissa Munsen's employment after Wellmark withdrew benefits for private duty nursing. However, as the Eighth Circuit Court of Appeals has explained, "Section 1132(a)(1)(B) provides [a beneficiary] a cause of action 'to enforce his rights under the terms of the plan,' it does not provide recourse for extracontractual damages related to a breach of the plan." *Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 942 (8th Cir.1999). Consequently, where the beneficiary has recovered benefits that should have been paid, the beneficiary has "recovered all that he is entitled to recover under this section." *Id.* at 942–43. Here, where the court concluded that the Munsens are entitled to lost benefits, they have recovered all that they are entitled to recover in this action; they are not entitled to any "extracontractual" damages for Melissa's lost income after Wellmark

phased out private duty nursing benefits, even if Melissa had to terminate her employment to provide care that Wellmark should have paid for. *See id.*

### 2. Future relief

Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), also provides that "a participant or beneficiary" may bring a civil action "to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Thus, a beneficiary is also entitled to a declaration that he or she is entitled to benefits in the future in accordance with the contract. *Welsh,* 54 F.3d at 1340.[9] In this case, the court concludes that, under the Benefits Certificate at issue here, as reasonably interpreted, the Munsens are entitled to 49 hours per week of private duty nursing services, at $39 per hour, from April 15, 2002, the date of the judgment in this case, until the expiration of the COBRA extension on December 31, 2003. However, as the Eighth Circuit Court of Appeals noted in *Welsh,* "nothing prevents the health insurance plan from evaluating whether [the beneficiary] continues to be [entitled to benefits] under the terms of the contract." *Welsh,* 54 F.3d at 1340.

### III. CONCLUSION

The court concludes that Wellmark has neither "reasonably" interpreted the terms of the Munsens' Benefits Certificate providing for private duty nursing benefits, nor has Wellmark "reasonably" concluded, based on "substantial evidence," that Maxwell Munsen is not entitled to such benefits under the terms of the Benefits Certificate, as reasonably interpreted. Therefore, **the court finds and declares** as follows:

---

9. Although the plaintiffs argue for such future relief under the standards for a permanent injunction, the court concludes that the statutory authorization for clarification of a right to future benefits provides the authority for such relief.

1. The Munsens are entitled to lost benefits for private duty nursing in the amount of $10,101, which constitutes 49 hours of private duty nursing services at $39 per hour, for the periods from October 28, 2002, through December 2, 2002, and April 14, 2003, through April 15, 2003; and

2. The Munsens are entitled to future benefits for 49 hours of private duty nursing per week at $39 per hour, from April 15, 2003, the date of the judgment in this case, until the expiration of the COBRA extension on December 31, 2003. However, nothing in this order prevents Wellmark from evaluating whether Maxwell Munsen continues to be entitled to private duty nursing benefits under the applicable terms of the Benefits Certificate, as interpreted herein.

**Judgment shall enter accordingly.**

**IT IS SO ORDERED.**